### ERICKSON v. LAMPI.

1. ANIMALS—LIEN FOR KEEPING—CHATTEL MORTGAGE—PRIORITY.
    A chattel mortgage on a team of horses takes precedence over a lien claimed for caring for and feeding them unless they were actually delivered to the lien claimant to be cared for and fed prior to the date of filing the mortgage.

2. SAME—RIGHT TO LIEN—POSSESSION.
    Where the owner of a team of horses kept them in defendant's barn, by permission, his teamster caring for them except on certain Sundays when defendant fed and cared for them for the teamster, and defendant furnished feed to be fed to them on the promise that he should be paid for it, defendant is not entitled, under section 10746, 3 Comp. Laws, to a lien for the stable rent and the value of feed furnished, there having been no delivery of the team to defendant to be kept and cared for.

Error to Gogebic; Cooper, J.   Submitted October 10, 1907.   (Docket No. 24.)   Decided November 5, 1907.

Replevin by Fred Erickson against Nante Lampi, Alex Oksa, and Mathilda Oksa.   There was judgment for defendants Oksa for the amount of a lien, under 3 Comp. Laws, § 10746, and plaintiff brings error.   Reversed.

*Julius J. Patek,* for appellant.

*Curtis Buck* (*Van Zile & Brownson,* of counsel), for appellees.

MONTGOMERY, J.    This is an action of replevin brought to recover a team of horses, harness, wagon, etc. The plaintiff claims by virtue of a chattel mortgage executed on the 21st day of February, 1905, and filed on the 24th of February of the same year.    The amount secured by the mortgage was $341, and exceeded the value of the property covered.    The defendants claim a lien upon the horses under the provisions of section ·10746, 3 Comp. Laws.    On the trial the jury found the defendants entitled to a lien to the amount of $80, and gave judgment in the defendants' favor in that amount.    A motion for a new trial was entered and refused, the reasons for denying the motion being given by the trial judge.

At the close of the testimony the plaintiff asked that a verdict be directed in his favor excluding the defendants' claim of lien.    The same point was again made on the motion for a new trial, and error is assigned upon rulings adverse to the plaintiff upon this point.    The theory of the judge's charge to the jury was, that unless there was an actual delivery of the team to defendant Oksa, by the owner, Lampi, to be cared for and fed, and that such delivery took place prior to the 24th of February, the plaintiff's chattel mortgage would have precedence over any claimed lien of the defendants.    This was a. correct view of the law.    *Reynolds* v. *Case,* 60 Mich. 76; *Denison* v. *Shuler,* 47 Mich. 598.

The court also charged the jury that if the team was delivered by the owner, Lampi, to defendant Oksa, or delivered by the teamster of Lampi under directions from the owner under an agreement that Oksa was to care for and feed the team, that this would entitle defendants to the claimed lien.    It is contended in this court, as it was in the court below, that, fairly construed, the testimony

on behalf of the defendants fails to show that there was in fact any such agreement. The defendant Oksa owned and occupied a barn. It was divided into two compartments, in one of which he kept his cow, and he testifies that Lampi, the owner of the team, wanted to rent the other compartment of the barn for his team of horses, and that an arrangement was made for $4 per month, Lampi to furnish his own feed for the horses. He then testifies that soon after the team was brought there he went to Lampi and said to him that he, Oksa, could not feed his horses; that Lampi replied, "You take care of the team, I pay you—you feed the team, I pay you." He further testified that Lampi in a conversation in the presence of witness' wife said to him, "You feed the horses so and so and I settle with you the first pay-day, when I get my first pay," and that he accordingly furnished the feed until the last of January, when Lampi bought seven or eight sacks of oats and seven or eight bales of hay. That he, Oksa, furnished the feed and the teamster took care of the horses; that he came there the same time the horses did and left on the 15th of March.

On cross-examination he testified as follows:

"*Q.* When Lampi came up to see you or when you went to see Lampi four days after the 15th of January, and told him that there was no feed there, didn't Lampi tell you, 'Give the teamster feed and I will pay you for it next pay-day?'

"*A.* Yes, sir. He didn't say 'Give the teamster.' He says 'You feed the team, I pay for it.' He don't mention anything about the teamster; he says 'You give the feed and I will pay for it.' He did not say I should drive the team and feed the team. The teamster was to feed my grub. In other words he told me to give the teamster the feed and the teamster would feed it. I am sure that is what he said. And he promised he would pay me for it the next pay-day.

"*Q.* Then what he told you was this, 'Let the teamster have what the horses need and I will pay you for it next pay-day?'

"*A.* Yes, sir, that is what he said, and he didn't say

any more; Lampi was then working the team himself. At that time I didn't ask Lampi's teamster nor tell him to drive the team for me. Lampi's teamster never had charge of the team for me. I did not tell any man, the teamster nor anybody else, to drive the team or feed the team or take care of the team for me. I didn't have any body take care of the team for me. The teamster took care of them for Lampi until he went away. I never hired him and never asked him to take care of the team for me. Up to the time that the teamster went away the teamster was all the time the only person that held the team for Lampi. Up to the time the teamster went away nobody had charge of the team for me. I understand only feeding the team belongs to me then. When I had to furnish the feed. I fed them Sundays when the teamster was away. That was the only time that I fed the team when the teamster went away Sundays, before I took sick. I don't ask anybody about money, for the taking care of the team for the teamster those different Sundays. The only time I took care of the team was for the teamster those Sundays when he was away, before the teamster went away. I had a talk with Lampi on the 15th of January when he rented the barn, then I had a talk with him when he said I should give the teamster hay and feed and he will pay me the next pay-day, and after that I could not remember exactly when. We had a good many more talks."

The defendant Oksa further testified as follows:

"*Q.* Were you to clean the horses, was that the bargain you made with Lampi?

"*A.* No, sir, all I was to do was, as I said before, furnish the feed for the horses and give it to the teamster and the teamster was to feed and take care of the horses."

The defendant Mathilda Oksa, wife of Alex, testified that soon after the horses were brought to the barn she heard a conversation with Lampi and her husband. That Lampi told her husband to take care of the team and clean them so that they got what they needed and he would pay him the first pay-day; that this occurred at the residence of the Oksas, that she heard him state that to her husband two or three times.

It is quite obvious that the witness is either referring to

some other occasion when she testifies that there was an arrangement that her husband was to clean the horses or that her testimony is so framed for the purpose of meeting the exigencies of the case. In either view, it must be held unavailing, for there was no pretense that Oksa ever did clean the horses prior to the time that the mortgage was given and filed, and it is quite clear that he never understood that he had contracted to perform any such duty.

It is argued in the brief of defendants' counsel that the so-called rent of the barn was no more than a license to occupy apartments in the building. Assuming this to be true, it gave exclusive right to the occupancy of this compartment in the barn until such license was revoked, and it could not be said that under such occupancy the possession of this team of horses was vested in the landlord or owner of the premises; and we have searched this record in vain to find the time or occasion when either actually or constructively the possession of this property was turned over from the defendant Lampi to the Oksas at any time prior to the giving and filing of this chattel mortgage. The language of the statute is that—

"Whenever any person shall deliver * * * to any person any horse, mul , neat-cattle, sheep, or swine to be kept or cared for, such * * * other person shall have a lien thereon * * * for the keeping and care of such animals, and may retain possession of the same until such charges are paid." 3 Comp. Laws, § 10746.

There was no delivery of this property to Oksa to be kept and cared for. It did not pass from the possession of Lampi. Oksa's possession was no different than would be that of the keeper of a feed-store who had furnished feed to be fed to these horses. The owner by his agent, the teamster, continued in possession; they were kept in a stable rented, as Oksa says, to the owner, and of which for the time defendant Oksa had no control whatever. He performed no service in the care of the team except such service as he voluntarily tendered for the teamster's relief when the latter was away on Sundays. The ques-

tion should not have been submitted as an open question for the jury.

The judgment will be reversed, with costs, and a new trial ordered.

McALVAY, C. J., and CARPENTER, GRANT, and BLAIR, JJ., concurred.